IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

IN THE MATTER OF THE SEARCH OF:

███████████████, BEDFORD NH 03110

Case No. 1:22-mj-113-01-AJ

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT APPLICATION

I, Daniel J. Fornash being first duly sworn, hereby depose and state as follows:

### I.    INTRODUCTION AND AGENT BACKGROUND

1.    I make this affidavit as a federal law enforcement officer in support of an application for a search warrant under Rule 41 of the Federal Rules of Criminal Procedure.  The search warrant seeks authorization to search the premises known as ████████████, Bedford, New Hampshire, as more specifically described in Attachment A, for evidence, fruits, and instrumentalities of violations of Title 26, United States Code, Sections 7201 (tax evasion), 7202 (willful failure to collect, account for, or pay over tax), and 7203 (failure to file return or pay tax), as more specifically described in Attachment B.

2.    Both Attachment A and Attachment B are incorporated herein by reference, as if set forth fully in this affidavit.

3.    I am a Special Agent of the United States Department of the Treasury, Internal Revenue Service-Criminal Investigation ("IRS-CI"), assigned to the Boston, Massachusetts Field Office.  I have been so employed since September 15, 2011.  My educational background includes a bachelor's degree in Business Administration from Plymouth State University.  I graduated from the Federal Law Enforcement Training Center Criminal Investigation Training Program and the National Criminal Investigation Training Academy, located in Glynco, Georgia,

in December 2011 and March 2012, respectively, and I have received extensive training in all aspects of criminal investigation.  As a special agent, my duties include investigating financial crimes, specifically criminal violations of the Internal Revenue Code and other criminal statutes. I have conducted and participated in numerous criminal investigations involving tax fraud. These investigations have focused primarily on individuals deriving income from legal and illegal sources.

4.      ███████████████, Bedford, New Hampshire is the residence of the target of this investigation, Andrew Park ("PARK") ████████████████████████████████, ██████████████████████.

5.      PARK is the owner of CarNow, Inc. ("CarNow"), a company that assists car dealerships to maximize car sales.  CarNow advertises itself as follows: "Our mission is to create simple, real-time experiences that streamline dealership operations and facilitate the transaction between dealers and their clients."  See https://www.carnow.com/ (last visited on May 13, 2022). KYUNG is an Associate Professor in Marketing at the Tuck School of Business at Dartmouth College.  See https://faculty.tuck.dartmouth.edu/ellie-j-kyung/.  She is currently a Visiting Scholar at The Wharton School at the University of Pennsylvania.  See https://marketing.wharton.upenn.edu/profile/ejkyung/.

6.      The Internal Revenue Service ("IRS"), a constituent agency of the U.S. Department of Treasury, has been conducting an investigation into alleged violations of federal criminal laws by PARK ██████████.  Since as early as approximately 2014, PARK ██ ██████ appear to have willfully attempted to evade and defeat income tax due and owing by failing to file income tax returns as required by law while also diverting income from corporate

to personal accounts, using corporate accounts to pay for personal items, making regular salary payments from CarNow to PARK disguised as reimbursements, and other affirmative acts. PARK further appears to have willfully failed to collect, truthfully account for and pay over to the IRS the federal income taxes and Federal Insurance Contributions Act ("FICA") taxes due and owing to the United States on behalf of CarNow's employees for all quarters during the years 2015 through 2020.

7.      Based on the facts set forth herein, I submit that there is probable cause to believe evidence, fruits, and instrumentalities of criminal offenses against the United States, to wit, violations of Title 26, United States Code, Sections 7201 (tax evasion), 7202 (willful failure to collect, account for, or pay over tax), and 7203 (failure to file return or pay tax) for the years 2015 through 2020 currently exist at PARK ▮▮▮▮▮ residence, which are described more fully in Attachment A.  The evidence, fruits, and instrumentalities include business and financial records relating to CarNow; financial records reflecting PARK ▮▮▮▮▮ income and expenses; records evidencing PARK ▮▮▮▮▮ communications with potential witnesses; records evidencing PARK ▮▮▮▮▮ control of financial accounts; proceeds from criminal activity; and computers and cell phones used by PARK ▮▮▮▮▮ during commission of the crimes, among other items.  As shown below, there is probable cause to believe that PARK owns and operates CarNow out of his home, within the District of New Hampshire, and has engaged in knowing and willful violations of 26 U.S.C. § 7201 (tax evasion), 26 U.S.C. § 7202 (failure to collect, truthfully account for, or pay over), and 26 U.S.C. § 7203 (failure to file).

3

8.      As further described below, I have probable cause to believe that the evidence, fruits, and instrumentalities exist in both physical and electronic form relating to PARK █████ ████████ roles in executing tax crimes.

9.      I base this affidavit upon my personal knowledge and observations made during the course of this investigation, information conveyed to me by other IRS employees, federal, state, and local law enforcement officers, and upon my personal review of records, documents, and other information.  This affidavit is offered for the sole purpose of establishing probable cause to execute search warrants at the location listed above and more fully described in Attachment A and does not set forth all of the facts observed by me or known to the United States during the course of the investigation.

## II.    APPLICABLE CRIMINAL LAWS

10.      *Title 26 U.S.C. § 7201 (tax evasion)* – Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be imprisoned a maximum of 5 years, fined a maximum of $250,000, and sentenced to a maximum 3 years supervised release, together with the costs of prosecution.  Failing to file a return, coupled with an affirmative act of evasion and a tax due and owing, is known as Spies evasion.

11.      *Title 26 U.S.C. § 7202 (willful failure to collect, account for, or pay over tax)* – Any person required under this title to collect, account for, and pay over any tax imposed by this title who willfully fails to collect or truthfully account for and pay over such tax shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be

imprisoned a maximum of 5 years, fined a maximum of $250,000, and sentenced to a maximum

3 years supervised release, together with the costs of prosecution.

12.    *Title 26 U.S.C. § 7203 (failure to file tax return or pay tax)* – Any person required

under this title to pay any estimated tax or tax, or required by this title or by regulations made

under authority thereof to make a return, keep any records, or supply any information, who

willfully fails to pay such estimated tax or tax, make such return, keep such records, or supply

such information, at the time or times required by law or regulations, shall be guilty of a

misdemeanor and, upon conviction thereof, shall be imprisoned a maximum of 1 year, fined a

maximum of $100,000, and sentenced to a maximum 1 year supervised release, together with the

costs of prosecution.

## III.    SUMMARY OF PROBABLE CAUSE THAT A CRIME HAS BEEN COMMITTED

### A.    Background of Subjects and Businesses

13.    PARK is the primary target of this investigation.  He ▮▮▮▮▮▮▮ currently

reside ▮▮▮▮▮▮▮▮▮▮▮ in Bedford, New Hampshire.  PARK received a bachelor's

degree from Yale University.  He currently owns and operates CarNow, a startup company in the

automobile industry that assists car dealerships to maximize car sales.  In the past he also

incorporated and operated Bidasq, Inc. ("Bidasq") and Wikets Inc. ("Wikets").  As addressed

below, Park operates CarNow, Bidasq, and Wikets such that all three companies share the same

IRS-assigned federal Employer Identification Number ("EIN"), even though EINs are intended

to be unique identifiers to help distinguish and identify a single corporate entity for tax purposes.

14.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Starting in 2010, KYUNG began

working as an Assistant Professor of Business Administration at the Tuck School of Business at

Dartmouth College. In 2016, she was elevated to Associate Professor of Business Administration. In 2021, KYUNG became a Visiting Scholar at the Wharton School of the University of Pennsylvania. She received a bachelor's degree from Yale University, a Master of Philosophy from New York University, and a Ph.D. from New York University. KYUNG's academic experience and research topics include marketing, consumer behavior, and judgment and decision making. See https://faculty.tuck.dartmouth.edu/ellie-j-kyung/curriculum-vitae/.

15. In December 2004, PARK and KYUNG purchased real estate at 13 McMartin Court, Jersey City, New Jersey. PARK and KYUNG previously resided at this property. After moving to Hanover, New Hampshire in approximately 2010, PARK and KYUNG began renting out their prior home in Jersey City. To date, they continue to own this property.

16. They resided at ▮▮▮▮▮▮▮▮▮ in Hanover until approximately September 2021. On approximately August 13, 2021, PARK and KYUNG purchased the home at ▮ ▮▮▮▮▮▮▮▮ in Bedford for $1,800,000 and moved into the home in approximately September 2021. There is no mortgage on the property, which suggests PARK and KYUNG paid for the home with cash.

17. PARK also owns Bidasq. According to JUSTIA's Trademark's resource, Bidasq is an online community for "real time voting on products, services, and personalities" and "interaction with other computer users." See https://trademarks.justia.com/776/47/bidasq-77647038.html. In July 2008, PARK applied on behalf of Bidasq to receive an EIN. The IRS assigned EIN ▮▮▮▮3826 to Bidasq. The address listed on the application was 13 McMartin Ct, Jersey City, New Jersey, which was PARK and KYUNG's residence at the time.

18.     The IRS database lists Bidasq as having annual filing requirements for Forms 940, 941, and 1120.  Businesses are required to file Forms 940 each year to report their federal unemployment tax calculations and payments to the IRS.  Businesses are required to file Forms 941 each quarter to report withheld income and FICA taxes, and to pay the employer's portion of FICA taxes.  (FICA taxes include 6.2% Social Security tax and 1.45% Medicare tax on employee earnings.  In addition to paying these taxes, employers are required to deduct an equivalent FICA tax from employee paychecks and pay over the money to the IRS on behalf of the employee.)  Domestic corporations are required to file Forms 1120 to report their income, gains, losses, deductions, and credits, and to determine their annual income tax liability.

19.     PARK also owned and operated Wikets, a smartphone application intended to "reward users for providing and sharing recommendations on products and places to their friends."  See https://techcrunch.com/2011/09/27/wikets-raises-1-5-million-from-andreessen-horrowitz-battery-for-its-new-social-commerce-app/.  PARK used ████████3826, assigned to Bidasq, to operate and file tax forms on behalf of Wikets.

### B.  PARK ██████████ 2008 and 2009 Tax Returns

20.     PARK and KYUNG filed U.S. individual income tax returns, Forms 1040, with the IRS for tax years 2008 and 2009.  In approximately 2011, the IRS audited PARK ██ ████████ individual tax returns for tax years 2008 and 2009.  The IRS made adjustments to both tax returns, resulting in additional tax due and owing for both years.  PARK ████████ filed an appeal with the IRS to dispute these tax adjustments.  While no change was made to the IRS's adjustment to the 2008 tax return, the IRS eliminated the adjustment it had made to the

2009 tax return.  As a result, PARK ▮▮▮▮▮ continued to have an outstanding balance on the 2008 tax return.

21.     The IRS Collections Division attempted to collect the outstanding tax balance for the 2008 tax return by issuing levies ▮▮▮▮▮ and JPMorgan Chase Bank, N.A. ("Chase Bank").  These levies eventually resulted in the outstanding balance for tax year 2008 being paid off.

22.     When the IRS levied ▮▮▮▮▮ received notifications from the IRS alerting ▮ to the levy.

**C.  PARK ▮▮▮▮▮ 2011 and 2012 Tax Returns**

23.     In August 2014, PARK ▮▮▮▮▮ filed U.S. individual income tax returns, Forms 1040, for tax years 2011 and 2012.  ▮ PARK ▮▮▮▮▮ signed these tax returns. On August 21, 2014, the IRS Collection Group at 1000 Elm Street, Suite 900, Manchester, New Hampshire received these returns.  The home address reported on both of these tax returns was ▮ ▮▮▮▮▮ Hanover, New Hampshire, which at the time was PARK and KYUNG's home residence.

24.     PARK ▮▮▮▮▮ reported that they both earned W-2 wages in both 2011 and 2012.  Specifically, they reported that during both years PARK earned income from Wikets Inc. and KYUNG earned income from Dartmouth College.  The tax returns included Forms W-2 from Wikets Inc. and Dartmouth College, respectively.  Both tax returns included Schedules E, which reports Supplemental Income and Losses.  The supplemental income reported on Schedules E for both 2011 and 2012 was rental income received from 13 McMartin Court, Jersey City, New Jersey.  This is the property PARK and KYUNG purchased in December 2004.

25.    The EIN reported on the Wikets Forms W-2 for the 2011 and 2012 tax returns was ███3826, the same EIN previously assigned to Bidasq. The Wikets Form W-2 attached to PARK ████████ 2011 tax return is handwritten. On it, Wikets reported PARK's wages as $118,333.35, with a total of $24,911.77 in withholdings ($18,710.34 in federal tax withholdings, $4,485.60 in Social Security tax withholdings, and $1,715.83 in Medicare tax withholdings). On the Wikets Form W-2 attached to PARK ████████ 2012 tax return, PARK's wages are listed as $100,000.05, with a total of $22,655.84 in withholdings ($17,005.84 in federal income tax withholdings, $4,200.00 in Social Security tax withholdings, and $1,450.00 in Medicare tax withholdings). A review of IRS records reveals that the Forms W-2 were not actually filed with the IRS by Wikets, none of these purported withholdings were actually paid over to the IRS, and Wikets filed no tax return with the IRS for these years.

26.    Based on my training and experience, I believe PARK ████████ 2011 and 2012 contain materially false items. Specifically, the Wikets Forms W-2 appear to be false. Wikets, which was solely owned by PARK, did not withhold any wages from PARK's 2011 or 2012 salary as reported on Forms W-2 and on PARK ████████ and 2012 Forms 1040. As a result of these fictitious withholdings, PARK ████████ and 2012 individual income tax returns generated fraudulent refunds to which they were not entitled. If PARK ████████ had not reported these withholdings, they would have owed taxes rather than receiving a refund. Because PARK controlled and utilized EIN ███3826, it appears he filed false federal tax returns with the IRS not by accident or mistake but knowingly and willfully.

**D. CarNow**

27.    In 2014 PARK established CarNow, again using EIN ▮▮▮3826 even though it was assigned to Bidasq.

28.    In 2014, the IRS began to receive tax returns electronically filed by individuals who worked for CarNow.  The number of employees electronically reporting income from CarNow has increased from two in 2014 to 105 in 2020.  Any employee filing paper tax returns is not as easily trackable by the IRS, so the total number of current employees could be higher.

29.    For tax year 2014, the IRS received two electronically filed tax returns with attached Forms W-2 reporting wages from CarNow (EIN ▮▮▮3826) and income taxes withheld, Social Security taxes withheld, and Medicare taxes withheld for 2014.  These 2014 Forms W-2 claimed total withholdings of approximately $4,398.00.  The Forms W-2 reported the address of CarNow as ▮▮▮ Hanover, New Hampshire, which was PARK and KYUNG's residence at the time.

30.    For tax year 2015, the IRS received nine electronically filed tax returns with Form W-2 reporting wages from CarNow (EIN ▮▮▮3826).  These 2015 Forms W-2 claimed total tax withholdings of approximately $169,840.00.  The Forms W-2 reported the address of CarNow as ▮▮▮ Hanover, New Hampshire.

31.    For tax year 2016, the IRS received 33 electronically filed tax returns with Forms W-2 reporting wages and withholdings from CarNow (EIN ▮▮▮3826).  These 2016 Forms W-2 reported total tax withholdings of approximately $410,401.00.  The Forms W-2 reported the address of CarNow as either ▮▮▮ Hanover, New Hampshire (PARK and KYUNG's former residence) or ▮▮▮ Hanover, New Hampshire (PARK and KYUNG's former residence until approximately September 2021).

32.     For tax year 2017, the IRS received 83 electronically filed tax returns with Forms W-2 reporting wages and withholdings from CarNow (EIN ███ 3826).  These 2017 Forms W-2 reported total tax withholdings of approximately $1,066,251.00.  The Forms W-2 again reported the address of CarNow as either ██████████ Hanover, New Hampshire (PARK and KYUNG's former residence) or ██████████ Hanover, New Hampshire (PARK and KYUNG's former residence).

33.     For tax year 2018, the IRS received 83 electronically filed tax returns with Forms W-2 reporting wages and withholdings from CarNow (EIN ███ 3826).  These 2018 Forms W-2 reported total tax withholdings of approximately $1,635,077.00.  The Forms W-2 again reported the address of CarNow as either ██████████ Hanover, New Hampshire (PARK and KYUNG's former residence) or ██████████ Hanover, New Hampshire (PARK and KYUNG's former residence).

34.     For tax year 2019, the IRS received 83 electronically filed tax returns with Forms W-2 reporting wages and withholdings from CarNow (EIN ███ 3826).  These 2019 Forms W-2 reported total tax withholdings of approximately $2,027,694.00.  The Forms W-2 again reported the address of CarNow as either ██████████ Hanover, New Hampshire (PARK and KYUNG's former residence) or ██████████ Hanover, New Hampshire (PARK and KYUNG's former residence).

35.     For tax year 2020, to date the IRS received 105 electronically filed tax returns with Forms W-2 reporting wages and withholdings from CarNow (EIN ███ 3826).  These 2020 Forms W-2 reported total employee tax withholdings of approximately $1,650,226.00.  The Forms W-2 again reported the address of CarNow as either ██████████ Hanover, New

Hampshire (PARK and KYUNG's former residence) or ███████████ Hanover, New Hampshire (PARK and KYUNG's former residence).

36.     All of the tax returns listed in Paragraphs 28 through 34 were filed electronically with the IRS.  The total amount of withholdings reported from 2014 to 2020 is approximately $6,963,887.00.  However, a review of IRS systems and Social Security Administration ("SSA") systems yielded zero withholdings actually paid over from CarNow to the IRS.  As such, the information on all of these Forms W-2 appears to be totally fabricated or, at the very least, cannot be verified as accurate by the records maintained by the IRS and SSA.  Likewise, a review of these systems revealed no employment taxes withheld or paid over on behalf of any of these employees for any of the years listed above.  Failure to withhold, account for, and pay over employment taxes is a violation of 26 U.S.C. § 7202.

**E.  CarNow's Bank Account and Records of State Tax Payment**

37.     On September 30, 2014 – approximately one month after PARK ███████ submitted their false 2011 and 2012 Forms 1040 – PARK opened a bank account at Bank of America on behalf CarNow (account number ██████49-85).  The account was opened at the Hanover, New Hampshire Bank of America branch.  Compliance documents retained by Bank of America show that when PARK opened the account, he established his identification using New Hampshire driver's license number 06PKA75081, which is a match for PARK's New Hampshire driver's license.  PARK is the sole signer on the account.

38.     On CarNow's Bank of America application, PARK listed EIN ██████3826, the same EIN associated with Bidasq and Wikets.  On the signature card, PARK checked the box for "C Corporation."  C Corporations have an annual income tax return filing requirement.

39.     PARK appears to have used account number ████49-85 as CarNow's payroll and operating account from its inception to today.  This account made regular payments to external accounts.  These payments include what appear to be regular, biweekly payments to CarNow employees.

40.     A review of the bank statements of account ████49-85 reveal what appear to be state tax payments to states to include the following state entities: Connecticut Department of Revenue; Georgia Department of Revenue; Illinois Department of Employment Security; Kentucky Department of Revenue; Comptroller of Maryland; Maryland Division of Unemployment Insurance; Massachusetts Department of Revenue; Uninsured Employers Fund of Montana; North Carolina Department of Revenue; South Carolina Department of Revenue. There are no records of payments to the U.S. Treasury or the IRS.

41.     A review of outgoing wires from Bank of America account ████49-85 establish that all such wires appear to have been initiated in New Hampshire.  As above, none of the wires were paid out to the U.S. Treasury or the IRS.

42.     A review of the IP log-in history for the CarNow Bank of America bank account shows that prior to September 2021, this account was accessed by an IP address associated with ████████ in Hanover, PARK and KYUNG's former residence.  Starting in approximately September 2021, this account began to be accessed by an IP address associated with ████████ in Bedford, PARK and KYUNG's current address.

**F.  Andrew Park** ████████ **Requirement to File Tax Returns**

43.     From tax years 2016 through 2019, PARK wired a total of $1,974,940.34 from CarNow's bank account at Bank of America (account number ████49-85) to PARK's

account at JP Morgan Chase Bank. PARK is listed as the beneficiary of these payments, and the recipient's associated address was ███████████ Hanover, New Hampshire, PARK AND KYUNG'S former residence. These wires are summarized by year as follows:

| Tax Year | Amount |
|---|---|
| 2016 | $278,765.02 |
| 2017 | $345,378.48 |
| 2018 | $384,798.73 |
| 2019 | $965,998.11 |
| Total | **$ 1,974,940.34** |

44. From tax year 2015 to present, KYUNG was employed as an Assistant Professor or Associate Professor of Business Administration at Dartmouth College. During this time she earned W-2 wages, summarized by year as follows:



45. For tax years 2014 to 2020, PARK ██████████ had an obligation to file tax returns and pay taxes. This obligation existed for PARK regardless of whether he considered himself "self-employed" or a W-2 earner. Specifically, from 2014 to 2020, the minimum self-employment income reporting requirement was $400. During the years under investigation,

PARK earned far more than this amount each year. From 2014 to 2020, the minimum W-2 income requirement for filing a tax return, for individuals filing under the "Married Filing Jointly" status, ranged between $20,600 to $24,800. During the years under investigation, both PARK ████████ earned far more than this amount each year.

46.    Given the wires PARK received from CarNow's payroll account that appear to be PARK's income from CarNow, as well as KYUNG's income from Dartmouth College, PARK ████████ had an obligation to file. By not filing a tax return for each of the tax years from 2014 to 2020, PARK ████████ violated Title 26 U.S.C. § 7203.

**G. Tax Evasion**

47.    Failing to file a return, coupled with an affirmative act of evasion and a tax due and owing, is known as Spies evasion. As detailed above, from 2013 to present PARK ██ ████ have failed to file federal income tax returns. There is a substantial tax due and owing for each year within this period. During this period, PARK ████████ committed the following affirmative acts in furtherance of evasion: diverted funds from business bank accounts to personal bank accounts; used business profits to pay for personal items; and paid PARK regular, untaxed deposits from CarNow's bank account that were categorized as reimbursements but were really just his monthly salary.

48.    Having filed tax returns in the past, both PARK ████████ demonstrated knowledge of their obligation to file tax returns and pay taxes. It is probable that records exist that will demonstrate evidence of the affirmative acts of evasion above as well as additional affirmative acts of evasion, in furtherance of PARK ████████ evasion in violation of Title 26 U.S.C. § 7201.

**H. CarNow's Obligation to File Tax Returns and Pay Corporate and Employment Taxes**

49.     When PARK incorporated CarNow, he selected C Corporation status for the company.  A C Corporation must file a tax return even if it earns no taxable income.  As a C Corporation, CarNow has an obligation to file annual federal income tax returns (Forms 1120), annual federal unemployment tax returns (Forms 940), and quarterly employment tax returns (Forms 941).  CarNow, however, has never filed a single Form 1120, Form 940, or Form 941.

50.     A consequence of a company failing to withhold, account for, and pay over employment taxes on behalf of its employees is a lack of contributions to each employee's Social Security and Medicare accounts.  When the employees working for EIN ▮▮▮3826 retire, they will have paid less into Social Security and Medicare – and therefore receive fewer benefits – than they believed that had paid.

51.     A further consequence of a company withholding but failing to account for and pay over employment taxes on behalf of its employees is an unfair competitive advantage over equally situated companies that do comply with their employment tax requirements.

52.     Because CarNow appears to be withholding employees' Social Security and Medicare contributions and not paying over these funds to the IRS, CarNow is effectively stealing its employees' withholdings.  This amounts to a theft equivalent to at least approximately 6.2% of every W-2 employee's salaries.

**I. CarNow Income Received**

53.     Because CarNow does not file tax returns with the IRS, the only way to determine the company's income is by reviewing Forms 1099 issued to CarNow.  A review of IRS databases revealed that from tax years 2011 to present, Forms 1099 were issued by various

payment processors to EIN ▮▮▮3826. As addressed above, this EIN was originally assigned to Bidasq but in recent years has been used by CarNow. Based on Forms 1099 issued by payment processors and received by the IRS, for tax year 2017, EIN ▮▮▮3826 was paid at least $1,373,454.00 in income. For tax year 2018, EIN ▮▮▮3826 was paid at least $3,584,613.00. For tax year 2019, EIN ▮▮▮3826 paid at least $5,640,965.00. For tax year 2020, EIN ▮▮▮3826 paid at least $8,561,758.00.

54.     The address used on all the Forms 1099 filed with the IRS for EIN ▮▮▮3826 was ▮▮▮▮▮ Hanover, New Hampshire.

## J. Use of Computers and Email

55.     PARK consistently uses computers and email in his operation of CarNow. PARK's email address at CarNow is andy@carnow.com. He uses this email address as the point of contact for filing state tax records; for example, PARK used andy@carnow.com to comply with Georgia's state tax requirements. He used andy@carnow.com to file all required quarterly wage reports, make tax payments, and correspond with employees at the Georgia Department of Revenue. The return address listed on all filings was PARK's former residence, ▮▮▮▮▮ Hanover, New Hampshire.

56.     CarNow's bank statements reflect that many of its other business receipts and payments, including payments to other state tax entities, likely were made electronically. Based on my training and experience, individuals frequently utilize the same email address for similar transactions. As such, I believe it is likely PARK used the same email address, andy@carnow.com, to make any such electronic payments.

57.     Based on my training and experience, PARK's regular use of email strongly suggests a consistent use of computers for business purposes.  As addressed at greater length below, there is a high probability that evidence of crimes related to CarNow will be found on computers located at PARK's residence.

## IV.    THE PREMISES

58.     A review of documents and records available indicate that necessary evidence and documents exist at ███████████████ Bedford, New Hampshire.

59.     Specifically, PARK does not appear to have any physical office location where he performs work for CarNow.  He and his family recently moved from ███████████████ in Hanover to ███████████████ in Bedford.  He appears to have frequently logged into CarNow's Bank of America bank account from an IP addressed associated with the Bedford address.  As such, all relevant business and personal records are likely to be found at his new residence.

60.     The Forms W-2 attached to the tax returns filed by employees use one of two Hanover, New Hampshire addresses, both of which are associated with PARK.  Records are likely to exist at PARK ███████ residence accounting for employees' payroll and withholdings.  These records will be needed to determine the total EIN ██████ 3826 employer tax liability.

61.     CarNow's bank account at Bank of America (account number ██████ 49-85) previously was accessed from the Hanover address associated with PARK ████████ residence.  Additionally, this bank account has been accessed electronically from PARK █ ██████ new residence in Bedford.  Records are likely to be maintained at PARK █

██████ residence relating to this bank account, including confirmation of PARK's ownership and control of the account, instructions on where to deposit items, and records related to PARK's transfers from CarNow's Bank of America account to PARK's personal bank account.  In addition, the bank records will show payments to state tax authorities and unemployment offices, as well as other business and personal expenditures.  Records located at PARK ██████ residence are likely to include addresses for CarNow employees, many of whom could be witnesses in this case.

62.     A review of the deposits into the Bank of America account show transactions with companies in Canada.  There are likely to be account receivable records at PARK ██████ residence.  These records are necessary to the tax loss calculation associated with PARK ██ ██████ tax evasion.

63.     EIN ███ 3826 was issued to PARK.  There is a Form 1120 filing obligation associated with the use of this EIN.  As such, the government seeks any records on site that can be used to complete a Form 1120 including receivables, payables, payroll, rental income, any other business income, and business expenditures.

64.     PARK ██████ have not filed federal income tax returns since tax year 2012. The government seeks documents relating to income, expenses, deductions, and withholdings that would be used to make a tax return, which are likely to exist in some format at their residence.

## V.    USE OF COMPUTERS FOR FINANCIAL CRIMES

### A.  Request to Seize Computers, Related Devices, and Related Records

65.    Based on my training, experience, and information learned during the investigation, I believe records and evidence, including computer and other electronic records, related to the aforementioned criminal offenses are likely to be found at PARK ▮▮▮▮ residence.

66.    Based on my training and experience, I know that financial crimes involve the fraudulent collection, transfer, recording, and use of financial information.  Accordingly, individuals involved in financial crimes often retain such information where they conduct business.  In my experience, these individuals also often create and maintain electronic records (e.g., computer records and phone records) for their schemes.

67.    As described above and in Attachment B, this application seeks permission to search for records that might be found at PARK ▮▮▮▮▮ residence in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, this Application seeks authorization to seize electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

68.    In addition, individuals involved in financial crimes often spend time online and on electronic devices communicating with co-conspirators and victims.  They are also likely to keep various items, including pieces of computer hardware, computer software, computer storage media, computer records regarding their criminal activities, and electronic correspondence with

others, on their computers. All of these items constitute evidence, contraband, fruits, or instrumentalities of financial crimes.

69.    Accordingly, this Application seeks authorization to search any computer hardware or computer related equipment capable of creating and/or storing information in electronic or magnetic form. Computer related equipment includes, but is not limited to, central processing unit(s), and/or peripheral equipment used to facilitate the creation, transmission, encoding or storage of information. Agents seek the authority to search for any and all information and/or data stored in the form of magnetic or electronic encoding on computer media, or on media capable of being read by a computer, or with the aid of computer related equipment. This media includes, but is not limited to, floppy disk(s), fixed hard disk(s), removable hard disk cartridge(s), tape(s), laser disk(s), videocassette(s), CD-ROM(s), zip disk(s), smart card(s), memory stick(s), memory calculator(s), PDA(s), and/or other media that is capable of storing magnetic coding.

70.    Based on my investigation, and as addressed in greater detail above, PARK uses the email address andy@carnow.com for CarNow activities. Documents and information received in response to a subpoena issued to the Georgia Department of Tax reveal that PARK uses this email address for business and tax purposes, including sending messages to representatives of the Georgia Department of Tax. Based on this information, and my training and experience, I have reason to believe that PARK is using computers and cell phones to send and receive business and financial related communications.

71.    *Probable Cause.*  I submit that if a computer or storage medium is found in the locations described in Attachment A, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.    Based on my knowledge, training, and experience, and on my collaboration with computer forensic analysts, I know that computer files or remnants of such files, including internet history, can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the internet.  Electronic files downloaded to a hard drive can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using readily available forensics tools.  This is so because when a person deletes a file on a home computer, the data contained in the file does not actually disappear.  Rather, the data remains on the hard drive until new data overrides the old data.  Therefore, deleted files, or remnants of deleted files, may reside in a computer for a long time.

b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.    Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from

22

operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence because special software is typically required for that task.  However, it is technically possible to delete this information.

       d.    Similarly, files that have been viewed via the internet are sometimes automatically downloaded into a temporary internet directory or "cache."

72.    <u>Necessity of seizing or copying entire computers or storage media</u>.  In most cases, a thorough search of a premises for information that might be stored on storage media requires the seizure of the physical storage media and later off-site review consistent with the warrant.  In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

       a.    <u>The time required for an examination</u>. As noted above, not all evidence takes the form of documents and files that can be easily viewed on-site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information.  Reviewing that

information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

        b.     <u>Technical requirements</u>. Computers can be configured in several different ways featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

        c.     <u>Variety of forms of electronic media</u>. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

73.    <u>Nature of examination</u>. Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant for which I am applying would permit seizing or imaging storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later examination consistent with the warrant.  The examination may require forensic techniques, including computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

74.    Additionally, if occupants of the premises are unwilling to cooperate with the executing agents regarding the operation of an on-site computer system or systems, or it appears there are data security devices involved, or the computer system or systems utilize unusual or proprietary equipment, or the agent determines the volume of material found on the premises is voluminous in size, or for any technical reason the executing agents cannot search for or image the information found on the premises, the computer system or systems and media may be seized.  Authority is sought to seize software, documentation and instruction manuals, operating logs and manuals, utility programs, compilers, interpreters, cabling and connectors, or any other equipment, programs, or software used to facilitate direct or indirect communication with the computer hardware and/or software.  Authority is sought to utilize the services of outside computer experts, who may not be federal law enforcement officers, in order to use and operate the computer systems at the above specified location for purposes of retrieving the above specified computer information during the course of the authorized search, provided that such experts operate under the direction, supervision, and control of myself or other Special Agents of the Internal Revenue Service.

## VI.    AFFIANT'S CONCLUSIONS

75.    Based on the information set forth in this affidavit, there exists probable cause to believe that PARK ████████, have committed violations of Title 26, United States Code, Sections 7201 (tax evasion), 7202 (willful failure to collect, account for, or pay over tax), and 7203 (failure to file return or pay tax).  There is probable cause to believe that evidence, fruits and instrumentalities of those crimes, as described in Attachment B – Items to be Seized, will be found at the residence of PARK ████████ as well as the business location of CarNow, as described in Attachment A.  Accordingly, I request a search warrant be issued authorizing the search of the locations described in Attachment A.

## VII.    REQUEST FOR SEALING

76.    It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.  I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time.  Based on my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet and disseminate them to other online criminals as they deem appropriate, i.e., by posting them publicly online through the carding forums.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

/s/ Daniel J. Fornash
Daniel J. Fornash
Special Agent
Internal Revenue Service-
Criminal Investigation

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Date:

Time:

Andrea K. Johnstone
United States Magistrate Judge

/s/ Daniel J. Fornash
Daniel J. Fornash
Special Agent
Internal Revenue Service-
Criminal Investigation

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Date:_____**Jun 10, 2022**_____

Time:_____**9:40 AM, Jun 10, 2022**_____

_____
Andrea K. Johnstone
United States Magistrate Judge

27

## ATTACHMENT A

*Property to be searched*

The property to be searched is ███████████████, **Bedford, New Hampshire** further described as a two-story house with white siding, gray roof, and black door.



**ATTACHMENT B**

*Property to be seized*

I.  All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of 26 U.S.C. §7201, 26 U.S.C. §7202, and 26 U.S.C. §7203 including, without limitation, from January 1, 2008 to present:

    a.  Records and tangible objects pertaining to the payment, receipts, transfer, or storage of money or other things of value by Andrew Park, ███████ ████████████████████████ CarNow, Inc., Bidasq Inc., Wikets Inc., including, without limitation:

        1.  Bank, credit union, investment, money transfer, and other financial account records;

        2.  Credit and debit card account records;

        3.  Copies of all federal and state tax returns and related schedules and work papers;

        4.  Records pertaining to business or personal expenses;

        5.  Records pertaining to income, whether from wages or investments;

        6.  Records related to the employment of Park and Kyung, including salary schedules, as well as federal tax forms, including but not limited to Forms W-2 and 1099;

        7.  Personnel and pay records for current and former employees of CarNow, Inc., Bidasq, Inc., and Wikets Inc., including records reflecting employee name, job title, Social Security number, or other designation, salary schedules, as well as all federal tax forms, including but not limited to Forms W-2 and 1099, 941 quarterly tax returns, 940 tax returns;

2

8. All loan and mortgage agreements and transactions, and lease and rental agreements and transactions, including repayment schedules of principal and interest;

9. General ledgers, general journals, sales journals, cash receipts journals, purchases journals, cash disbursement journals, and any other records that record income and expenses;

10. Invoices, inventory sheets, daily reconciliations, receipts for cash payments, cash register tapes, depreciation schedules and workpapers, trial balances, financial statements, credit card receipts, and adjusting entries;

11. Receipts, requests for payments, cancelled checks, and other documents and records evidencing payments requested or received for goods;

12. Financial documents and ledgers showing deposits, payments and withdrawals, bank checks, wire transactions, money orders, bank statements, and similar documents reflecting receipts and disbursements of funds;

13. Documents and records pertaining to cash transactions, including receipts from cash deposits, disbursements or withdrawals, or cash or cash equivalents;

14. All register tapes, Z-tapes, or any other print out which would reflect sales activities.

b. Contracts, agreements, and other documentation evidencing affiliation or business relationships with distributors, suppliers, and records verifying or concerning financial dealings with such distributors and suppliers;

c. Documents that would be or were utilized to prepare federal and state individual income tax returns, corporate tax returns, or employment tax returns;

d. All currency and other monetary instruments;

3

e.  Point of Sale (POS) Systems;

f.  For any computer hardware, computer software, computer-related

documentation, or storage media called for by this warrant or that might

contain things otherwise called for by this warrant ("the computer

equipment"):

    1.  Evidence of who used, owned, or controlled the computer equipment;

    2.  Evidence of computer software that would allow others to control items, evidence of the lack of such malicious software, and evidence of the presence or absence of security software designed to detect malicious software;

    3.  Evidence of the attachment of other computer hardware or storage media;

    4.  Evidence of counter-forensic programs and associated data that are designed to eliminate data;

    5.  Evidence of the times that computer equipment was use;

    6.  Passwords, encryption keys, and other access devices that may be necessary to access the computer equipment;

    7.  Records and tangible objects pertaining to accounts held with companies providing Internet access or remote storage of either data storage media;

g.  Records and tangible objects relating to ownership, occupancy, or use of the

premises to be searched (such as utility bills, phone bills, rent payments,

mortgage payments, photographs, insurance documentation, receipts and

check registers).

4

II.    All computer hardware, computer software, computer-related documentation, and

storage media.


**DEFINITIONS**

For the purpose of this warrant:

1.  "Computer equipment" means any computer hardware, computer software, computer-related documentation, storage media, and data.

2.  "Computer hardware" means any electronic device capable of data processing (such as a computer, personal digital assistant, cellular telephone, or wireless communication device); any peripheral input/output device (such as a keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any connections), and any security device, (such as electronic data security hardware and physical locks and keys).

3.  "Computer software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately, inadvertently, or automatically.

4.  "Computer-related documentation" means any material that explains or illustrates the configuration or use of any seized computer hardware, software, or related items.

5.  "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, or memory card).

6.  "Data" means all information stored on storage media of any form in any storage format and for any purpose.

5

7.  "A record" is any communication, representation, information or data. A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

## RETURN OF SEIZED COMPUTER EQUIPMENT

If, after inspecting seized computer equipment, the government determines that the equipment does not contain contraband or the passwords, account information, or personally identifying information of victims, and the original is no longer necessary to retrieve and preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned, within a reasonable time, if the party seeking return will stipulate for a forensic copy's authenticity (but not necessary relevancy or admissibility) for evidentiary purpose.

If computer equipment cannot be returned, agents will make available to the computer system's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; password, account information, or personally identifying information of victims; or the fruits or instrumentalities of crime.